**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

————————

No. 06-1680

————————

**UNITED STATES OF AMERICA,**

Appellee,

v.

**FABIO MONTANO,**

Appellant.

————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE GARY A. FENNER, DISTRICT JUDGE

————————

**BRIEF FOR THE UNITED STATES**

————————

JOHN F. WOOD
  United States Attorney

GREGG R. COONROD
  Assistant United States Attorney

KATHLEEN D. MAHONEY
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri  64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

# SUMMARY OF THE CASE

The appellant, Fabio Montano, was convicted by a jury of conspiracy to distribute five kilograms or more cocaine, and was sentenced to 405 months' imprisonment.

Although witnesses testified that Montano bought and sold multiple kilograms of cocaine, he nevertheless contends on this appeal that the district court erred by denying his motion for judgment of acquittal at the close of the evidence. In addition, Montano argues that the district court abused its discretion by allowing the Government to present evidence of the terminal act of the charged drug conspiracy - the murder of Julian Colon.

It is the Government's position that ample evidence supports Montano's conviction. Further, evidence of the murder was properly admitted, as the murder was inextricably intertwined with the drug conspiracy as well as the law enforcement investigation of that conspiracy, and the murder was committed in furtherance of the drug conspiracy and was reasonably foreseeable to Montano.

Montano has waived oral argument; the Government agrees that this case should be submitted on the briefs.

Appellate Case: 06-1680    Page: 2    Date Filed: 05/02/2007 Entry ID: 3306101

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF THE ARGUMENTS  . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARGUMENTS

    I.    Montano's conspiracy conviction was supported by more than sufficient evidence, where seven witnesses testified about Montano's involvement in the drug conspiracy, and that testimony was corroborated by phone records, wire transfers , and physical evidence obtained in search warrants . . . . . . . . . . . 25

    II.    The district court did not abuse its discretion in allowing the Government to present evidence of a murder committed in furtherance of the drug conspiracy with which Montano was charged, where that murder was committed by co-conspirators known to employ violence in their drug dealings . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Appellate Case: 06-1680    Page: 3    Date Filed: 05/02/2007 Entry ID: 3306101

# TABLE OF AUTHORITIES

**Page**

## Cases

*Pinkerton v. United States*, 328 U.S. 640 (1946) . . . . . . . . . . . . . . . 2, 42, 43

*United States v. Armstrong*, 253 F.3d 335 (8th Cir. 2001) . . . . . . . . . . . . . 26

*United States v. Baker*, 855 F.2d 1353 (8th Cir. 1988) . . . . . . . . . . . . . . . 37

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . 39

*United States v. Bass*, 794 F.2d 1305 (8th Cir. 1986) . . . . . . . . . . . . . . 2, 39

*United States v. Cabrera*, 116 F.3d 1243 (8th Cir. 1997) . . . . . . . . . . . . . 31

*United States v. Carter*, ___ F.3d ___, 2007 WL. 861092
    (8th Cir., Mar. 23, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Castro-Gaxiola*, 479 F.3d 579 (8th Cir. 2007) . . . . . . . . . 26

*United States v. Chin*, 83 F.3d 83 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 39

*United States v. Claxton*, 276 F.3d 420 (8th Cir. 2002) . . . . . . . . . . . . . . 36

*United States v. Conely*, 503 F.2d 520 (8th Cir. 1995) . . . . . . . . . . . . . 37, 38

*United States v. Crenshaw*, 359 F.3d 977 (8th Cir. 2004) . . . . . . . . . . . . . 32

*United States v. Cruz*, 285 F.3d 692 (8th Cir. 2002) . . . . . . . . . . . . . . 26, 27

*United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995) . . . . . . . . . . . . . . 42

*United States v. Dierling*, 131 F.3d 722 (8th Cir. 1997) . . . 2, 33, 37, 38, 39

*United States v. Escobar*, 50 F.3d 1414 (8th Cir. 1995) . . . . . . . . . . . . . . 42

-iii-

*United States v. Espino*, 317 F.3d 788 (8th Cir. 2003) . . . . . . . . 2, 29, 30, 32

*United States v. Gadson*, 74 Fed. Appx. 245, 248 (4th Cir. 2003) . . . . . . . 39

*United States v. Hayes*, 391 F.3d 958 (8th Cir. 2004) . . . . . . . . . . . . . . . . 28

*United States v. Hicks*, 368 F.3d 801 (7th Cir. 2004) . . . . . . . . . . . . . . . . 39

*United States v. Kamerud*, 326 F.3d 1008 (8th Cir. 2003) . . . . . . . . . . . 2, 28

*United States v. Lop Bounmy*, 403 F.3d 1018 (8th Cir. 2005) . . . . . . . . . 32

*United States v. Maynie*, 257 F.3d 908 (8th Cir. 2001) . . . . . . . . . . . . . . . 37

*United States v. McCracken*, 110 F.3d 535 (8th Cir. 1997) . . . . . . . . . . . . 26

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . 39

*United States v. Meester*, 762 F.2d 867 (11th Cir. 1985) . . . . . . . . . 2, 36, 37

*United States v. Narvarrete-Barron*, 192 F.3d 786 (8th Cir. 1999) . . . . . . 42

*United States v. Noland*, 960 F.2d 1384 (8th Cir. 1992) . . . . . . . . . . . . . . 36

*United States v. Oleson*, 310 F.3d 1085 (8th Cir. 2002) . . . . . . . . . . . . . . 26

*United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002) . . . . . . . . . . . . . . . . . 5

*United States v. Smith*, 2006 WL. 3144383 (D. Kan. 2006) . . . . . . . . . . . 39

*United States v. Stone*, 2006 WL. 436012 (E.D.N.Y 2006) . . . . . . . . . . . 42

*United States v. Tensley*, 334 F.3d 790 (8th Cir. 2003) . . . 2, 26, 27, 30, 31

*United States v. Tramunti*, 513 F.2d 1087 (2d Cir. 1975) . . . . . . . . . . . . . 37

*United States v. Williams*, 181 F. Supp. 2d 267 (S.D.N.Y. 2001) . . 6, 41, 42

## **Statutes**

Appellate Case: 06-1680    Page: 5    Date Filed: 05/02/2007 Entry ID: 3306101

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Appellate Case: 06-1680    Page: 6    Date Filed: 05/02/2007 Entry ID: 3306101

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

————————————

No. 06-1680

————————————

**UNITED STATES OF AMERICA,**

Appellee,

v.

**FABIO MONTANO,**

Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE GARY A. FENNER, DISTRICT JUDGE

————————————

**STATEMENT OF THE ISSUES**

————————————

**I.**

Whether the district court correctly denied Montano's motion for judgment of acquittal under Count One, where the evidence showed that Montano and other co-conspirators were acting together in buying and selling cocaine.

-1-

## Cases

*United States v. Tensley*, 334 F.3d 790 (8th Cir. 2003)

*United States v. Kamerud*, 326 F.3d 1008 (8th Cir. 2003)

*United States v. Espino*, 317 F.3d 788 (8th Cir. 2003)

## II.

Whether the district court abused its discretion in allowing the Government to present evidence of a murder committed by Montano's co-defendants in furtherance of the charged conspiracy, where the co-defendants were known to employ violence and where the murder was inextricably intertwined with evidence of the drug conspiracy.

## Cases

*United States v. Dierling*, 131 F.3d 722 (8th Cir. 1997)

*United States v. Bass*, 794 F.2d 1305 (8th Cir. 1986)

*Pinkerton v. United States*, 328 U.S. 640 (1946)

*United States v. Meester*, 762 F.2d 867 (11th Cir. 1985)

Appellate Case: 06-1680    Page: 8    Date Filed: 05/02/2007 Entry ID: 3306101

# STATEMENT OF THE CASE

**A.      _Procedural History_**

On March 25, 1999, a federal grand jury sitting in the Western District of Missouri returned a four-count superseding indictment against defendants Edwin Hinestroza, German Sinisterra, Arboleda Ortiz, Plutarco Tello, Percy Smith, and Fabio Montano charging: (1) conspiracy to distribute cocaine, a Schedule II controlled substance, in an amount of five kilograms or more; (2) aiding and abetting the use of a firearm in relation to a drug trafficking crime and committing a murder in the perpetration of a drug trafficking crime; (3) knowingly traveling in interstate commerce with the intent that a murder-for-hire be committed; and (4) criminal forfeiture.  (D.E. 142.)[1]  Smith and Montano were charged only in Count One, while Hinestroza, Sinisterra, Ortiz and Tello were charged in Counts One through Three.  Counts Two and Three both related to the terminal act of the drug conspiracy charged in Count One - the murder of Julian Colon on November 28, 1998, in Kansas City, Missouri.

---

[1]"D.E." refers to the pleadings, orders, and other documents as chronicled on the district court's docket sheet.

Appellate Case: 06-1680      Page: 9      Date Filed: 05/02/2007 Entry ID: 3306101

During motion practice for their case, Smith and Montano moved to sever themselves from the three defendants[2] also charged with murder. (D.E. 217.) United States Magistrate Judge Sarah W. Hays granted the motion for severance. The Government then filed a motion to reconsider severance. (D.E. 227.) The Honorable Fernando J. Gaitan, Jr., United States District Judge, denied the Government's motion, upholding the severance of Smith and Montano from Sinisterra, Ortiz, and Tello. (D.E. 241.)

On August 9, 1999, the grand jury returned a second superseding indictment with the same charges. (D.E. 257.) On August 30, 1999, the court granted the Government's motion to dismiss, without prejudice, defendants Montano and Smith from the second superseding indictment. (D.E. 286.)

The case proceeded to trial against Sinisterra, Ortiz, and Tello in April 2000. All three were found guilty of all three counts. In addition, Sinisterra was found guilty on one count of criminal forfeiture. Sinisterra and Ortiz were sentenced to death on Counts Two and Three and a custodial sentence of 324 months on Count One. Tello was sentenced to life imprisonment on Counts Two and Three, and a custodial sentence of 324 months on Count One.

---

[2]The other three defendants charged with murder at that time were Sinisterra, Ortiz, and Tello. Hinestroza remained a fugitive until February 2004.

-4-

Their convictions and sentences were affirmed on appeal by the Eighth Circuit. *See United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002).

Charges were subsequently re-filed against Smith and Montano in the form of a third superseding indictment returned by the grand jury on November 18, 2003.[3] (D.E. 890.) Hinestroza, who had been a fugitive since the original filing of charges against him, was arrested in Tennessee in February 2004, using an alias. Montano was arrested in September 2004, in Beaumont, Texas, using the alias "Antonio Smith." (T. Tr. Vol. III at 499.)[4] Smith, Anderson, and Mosquera pled guilty, leaving only Montano and Hinestroza for trial.

The federal grand jury returned a fourth superseding indictment on March 9, 2004, against the same defendants charging the same crimes as the preceding indictments. (D.E. 931.) Montano moved for severance from Hinestroza, who was charged with capital crimes in Counts Two and Three of the fourth superseding indictment. (D.E. 1016.) On March 28, 2005, United States Magistrate Judge Sarah W. Hays, Western District of Missouri granted

_____

[3]Defendants Shelly Anderson and Airton Mosquera were added to this indictment; they had not previously been charged.

[4]"T. Tr. Vol." refers to the transcript of the trial proceedings, specifically identifying the volume number and page of significance.

-5-

Montano's motion for severance.[5] (D.E. 1022.)  In granting severance, Judge Hays cited two concerns: (1) the risk of "spillover prejudice" from trying a capital and non-capital defendant together; and (2) the length of Montano's pre-trial detention if he had to wait until October 31, 2005, for trial, rather than going to trial May 23, 2005.  (D.E. 1022 at 4-5.)  In her order, Judge Hays quoted *United States v. Williams*, 181 F.Supp.2d 267, 301-02 (S.D.N.Y. 2001), with regard to "spillover prejudice:"

> The Government [argues] that since the acts of violence . . . were carried out in furtherance . . . of the narcotics conspiracy, proof of murder and attempted murder would be admissible against Ms. Rolon as overt acts in furtherance of the conspiracy. Even assuming, *arguendo*, that the Government is correct in this assertion, while proof of the violent acts themselves may be admissible, evidence of the details of those acts, such as grisly photos of the crime scene or the victims, would likely not be admissible to prove the narcotics conspiracy.  *See* Fed.R.Evid. 403.  Thus it appears that there is a significant risk that powerful evidence that would not be admissible against Ms. Rolon will be introduced in a joint trial against her co-defendants, and, consequently, a real risk of spillover prejudice.

(D.E. 1022 at 4.)

---

[5]Hinestroza was found guilty of all counts in a jury trial held October 31, 2005, through November 17, 2005.  At the sentencing phase of the trial, the Government sought the death penalty.  The jury could not agree on punishment; accordingly Hinestroza was sentenced to life imprisonment on Counts Two and Three.  He did not file notice of appeal.

-6-

On May 18, 2005, the parties appeared before the Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, for a pretrial conference. At the conference, counsel for Montano orally moved to preclude the Government from presenting evidence of Julian Colon's murder during Montano's trial. The court held that if the Government could lay a foundation showing that Montano's co-defendants Hinestroza, Sinisterra, Ortiz, and Tello were known enforcers or killers within the conspiracy, then evidence of the co-conspirator actions, including the murder, would be admissible. (Pretrial Tr. 16.)[6]

On May 23, 2005, Montano appeared before Judge Fenner and a five-day jury trial ensued. On May 27, 2005, a jury returned a verdict of guilty with respect to the one count in which Montano was named, conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841 (a)(1), (b)(1)(A), and 846. (D.E. 1066.) On February 28, 2006, Judge Fenner sentenced Montano to 405 months' imprisonment. (D.E. 1265.)

Montano filed a timely notice of appeal on March 4, 2006. (D.E. 1268.)

---

[6] "Pretrial Tr." refers to the 18-page transcript of the pretrial conference held May 18, 2005.

-7-

## STATEMENT OF THE FACTS

The evidence at trial established that Edwin Hinestroza ran a cocaine distribution ring in the Kansas City metropolitan area from 1996 to November 28, 1998. He was assisted by Andres Borja-Molina ("Borja") and Borja's uncle, Julian Colon ("Colon"). Cocaine shipments came from "La Oficina" ("the office" - a drug cartel) in Colombia, South America, via Mexico and Houston. (T. Tr. Vol. IV at 772-73.) Jaime Hurtado ran the cocaine operation in Houston.[7] To transport the cocaine from Houston, where it first arrived from Mexico, Hinestroza employed several individuals, including Sinisterra, a co-defendant convicted in a prior trial, and Shelly Anderson, a co-defendant who pled guilty as charged to conspiracy to distribute five kilograms or more cocaine. The cocaine was driven to Kansas City in cars containing false compartments. Borja testified, and drug ledgers confirm, that each shipment included 5 to 50 kilograms cocaine. The cocaine was then sold to five major customers in the Kansas City area on consignment: (1) Fabio Montano, a/k/a "Fernando" or "Fercho"; (2) Percy Smith, a/k/a "Y.C."; (3) Dominic Lusk, a/k/a "Nick"; (4) "Pipi"; and (5) "Kiki." (T. Tr. Vol. IV at 773.) Once

---

[7]After the murder of Julian Colon, Hurtado returned to Colombia, where he was shot and killed. This evidence was not presented to the jury. (T. Tr. Vol. IV at 769.)

Appellate Case: 06-1680     Page: 14     Date Filed: 05/02/2007 Entry ID: 3306101

those customers paid for the cocaine, the money was sent back to Houston. Borja indicated that the price for the fronted cocaine ranged between $15,000 and $21,000 per kilogram. When the fronted debt was repaid, all the money was collected and sent to Houston in one of the vehicles with false compartments. Hinestroza maintained two stash houses in Kansas City; one was for money, the other for cocaine. (T. Tr. Vol. II at 83.)

Of the five major customers, the two largest were Fabio Montano (a/k/a "Fernando" or "Fercho") and Percy Smith (a/k/a "Y.C."). (T. Tr. Vol. I at 26.) Montano was identified as one of Hinestroza's personal friends. (T. Tr. Vol. I at 28.)

Edwin Hinestroza lived in the Kansas City area with Monica Osma, who is the sister of Julian Colon and the maternal aunt of Borja. On November 19, 1998, the apartment Hinestroza and Osma shared was robbed. Reportedly, the apartment was robbed by two unknown males who tied and beat Monica Osma and demanded to know where she kept the money. After being beaten, Osma told the intruders that the third stair on the staircase contained a false compartment in which money could be found. The apartment was found ransacked, with approximately $240,000 being stolen. Osma was sent to Houston to recover from her injuries, which required hospital attention. (T. Tr. Vol. II at 84-86.)

-9-

Amparo Molina, Monica's sister, picked Osma up from the airport in Houston. On Thanksgiving Day, November 26, 1998, Osma was visited at her sister's apartment by Edwin Hinestroza, Jaime Hurtado, and two Colombian males. (T. Tr. Vol. II at 222.) One of the Colombian males was identified as Arboleda Ortiz, while the other was identified as Plutarco Tello by Edward Ortiz.[8] (T. Tr. Vol. II at 226-27.) During this meeting, the Colombians, who purported to represent "La Oficina," or the drug cartel, began questioning Osma regarding how the money in the apartment robbery had been taken. The man identified as Plutarco Tello asked numerous questions. Questioning continued and the Colombians asked to see photographs and hospital reports detailing Osma's injuries. Apparently not satisfied with Osma's story or injuries, the Colombians stated "Muracco." (T. Tr. Vol. II at 222-24, 254.) Roughly translated, this is a death threat which means that if a dead body does not appear, the people at the office are not going to be satisfied. As everyone left Amparo Molina's apartment, Edward Ortiz saw German Sinisterra on the street outside the apartment. Sinisterra, a/k/a "Waja," was known by Edward Ortiz

---

[8]Edward Ortiz is Amparo Molina's youngest son and Heberth Andres Borja-Molina's brother. Edward Ortiz was born in 1985, and was therefore only 11 to 13 years-old during the charged drug conspiracy. (T. Tr. Vol. II at 210.) He is not related to Montano's co-defendant Arboleda Ortiz.

-10-

as a killer. Ortiz testified, "[I]f you need someone to get smoked or whatever, just tell Waja, he'll do it." (T. Tr. Vol. II at 228-29.)

Back in Kansas City on November 28, 1998, Edwin Hinestroza asked Borja and Colon to accompany him to the Drury Inn at I-435 and Metcalf Avenue, Overland Park, Kansas, where they were to meet with three Colombian males. (T. Tr. Vol. II at 93.) Borja identified these individuals as German Sinisterra, Arboleda Ortiz, and Plutarco Tello, when he was shown photo spreads by Kansas City, Missouri Police Department detectives. Borja related that he previously met Sinisterra and Ortiz in Houston and knew them as associates of Hinestroza. Borja testified that Sinisterra was known in the drug conspiracy as, "gun for hire, muscle for hire." (T. Tr. Vol. II at 90.) Ortiz was also identified by Borja as "gun for hire." (T. Tr. Vol. II at 91.) Borja testified that Sinisterra served as Jaime Hurtado's right-hand man and Ortiz served in the same capacity for Fabio Montano. In fact, Borja testified that Ortiz received kilograms of cocaine on Montano's behalf. (T. Tr. Vol. II at 146-47.) Borja knew Ortiz as someone who offered his services (for violence) cheaply. (T. Tr. Vol. II at 147.) Hinestroza told Borja that the three Colombians would accompany them to meet with one of Hinestroza's local distributors, Percy Smith or "Y.C.," for the purpose of selling him over one kilogram of fake cocaine. This deal was a sham that was devised because Hinestroza told Borja

-11-

that he believed "Y.C." was responsible for the theft of the $240,000 in drug proceeds from his apartment. (T. Tr. Vol. II at 89.) Hinestroza told Borja that the Colombians they were meeting had been hired to help collect the debt. When speaking about the three Colombian males, Hinestroza told Borja, "they always send the same people to do the same jobs." (T. Tr. Vol. II at 93.) The job being discussed was "to go tie up Y.C. and gag him up and maybe kill him." (T. Tr. Vol. II at 93.)

Borja, Colon, Hinestroza, and the Colombians met at and departed from the Drury Inn. After meeting with "Y.C." at an unknown location in Kansas City, Missouri, the makeshift group followed "Y.C." to a second house, also in Kansas City, Missouri, which was approximately five minutes away. At this house, "Y.C." stayed in his car while Borja, Colon, Hinestroza, and the three Colombian males went into the residence. (T. Tr. Vol. II at 96-97.) Once inside, Hinestroza and the Colombian males put handguns to both Borja's and Colon's heads. Borja and Colon were then bound with duct tape and physically assaulted by all four individuals. As the suspects continued beating Borja and Colon, they demanded to know where the money was, referencing the lost drug proceeds of approximately $240,000. The suspect identified as Tello demanded, "Where's my $300,000, where?" (T. Tr. Vol. II at 99.) As the beatings continued, so did the demands, taunts, and threats of death. Borja was

-12-

dragged to the basement of the residence by one of the Colombian males and could hear his uncle, Julian Colon, screaming upstairs from his location in the bathroom. Borja overheard Hinestroza order the Colombian males to "shoot him in the head," and then heard, "shoot the other one, too."[9] Shortly thereafter, Borja heard a single gunshot and Colon stopped screaming. (T. Tr. Vol. II at 100.)

As Borja laid in the basement, he heard footsteps come down the stairs, followed by the sound of a gunshot and loud ringing in his ears. Initially, Borja believed he was dead, but realized that in fact he was not; whereupon he pretended to be dead in order to survive. Hinestroza and the other suspects then carried Borja to the trunk of a vehicle where they deposited his body alongside Colon's. The vehicle was driven to Swope Park, where it and the bodies were abandoned. (T. Tr. Vol. II at 100-03.)

By kicking the inside of the trunk and fidgeting with the lock, Borja managed to escape the vehicle and observed Colon still in the trunk of the car surrounded by a large amount of blood. Borja then called Savannah Colon, wife of Julian Colon. Savannah Colon responded to Borja's location and helped transport Julian Colon to Menorah Medical Center where she and Borja were

_____

[9]This conversation occurred in Spanish.

-13-

contacted by police. (T. Tr. Vol. II at 103-08.) Police noted that Colon was lying in the back seat; that there was a lot of blood around him; and that his hands, feet, mouth, and eyes were bound with duct tape. Colon was pronounced dead at the hospital.

Borja exposed the Hinestroza drug conspiracy to law enforcement that night. He had the Overland Park, Kansas police contact the FBI, and Borja began cooperating with both agencies, as well as the Kansas City, Missouri Police Department that night and into the next morning. (T. Tr. Vol. IV at 557-58.) Borja told police what had occurred and further related that earlier that evening he and Colon had met their attackers at the Drury Inn, located at I-435 and Metcalf Avenue. Borja also stated that their attackers were driving a black Mazda pickup truck. Savannah Colon informed police that her now deceased husband had called her earlier in the evening and asked her to take down a Texas license plate number. Savannah Colon testified that Colon had called with the license plate and told her if she did not hear from him by 9:30 that evening, to call the police with the information. (T. Tr. Vol. III at 396-97.) The license plate number was identified as belonging to suspect German Sinisterra. Police went to the Drury Inn and took two suspects into custody, each without incident. The two suspects were identified as German Sinisterra and Arboleda Ortiz. The third suspect, Plutarco Tello, was taken into custody

-14-

without incident a few hours later inside the hotel. (T. Tr. Vol. II at 343-45.) Telephone records obtained by the FBI showed that Hinestroza fled to Texas immediately following Colon's murder. (T. Tr. Vol. IV at 732.)

On November 29, 1998, Special Agent (SA) Amy Hess (FBI) accompanied Borja to his apartment in Overland Park, Kansas, where he provided SA Hess with several notebooks and pieces of paper containing names and telephone numbers of individuals Borja identified as drug customers. Additionally, Borja identified three sheets of paper as drug ledgers which depicted the quantity of drugs delivered to, and money received from, several local customers. (T. Tr. Vol. II at 111, 164-75.) Borja pointed out an apartment identified as Montano's primary residence, located at the Hawthorne On The Lake Apartments, 5319 West 119th Terrace, Apartment 114, Overland Park, Kansas. Parked in front of the apartment was a newer model, dark-colored Lexus bearing Kansas license plate MVH-811, which Borja identified as Fabio Montano's car.

A subsequent search of Montano's car revealed a note with the name German Sinisterra on it, a piece of paper with the name 'Artis' on it, a knife, and receipts for cash and wire transfers. (T. Tr. Vol. II at 478, 481-83.) A search of Montano's apartment revealed two loaded handguns (one a .44 Magnum revolver), receipts for cash, and a Sunbeam scale. (T. Tr. Vol. III at

-15-

462, 467, 472-73; T. Tr. Vol. IV at 732.)  Police also searched a different apartment which Montano had recently abandoned, and about which police had received complaints of suspicious, late-night activity.  (T. Tr. Vol. II at 349.)  Sergeant Mike Kelly with the Overland Park Police Department testified that late-night traffic at a residence can be an indicator of narcotics trafficking.  (T. Tr. Vol. II at 349-50.)  Police recovered in the search of Montano's abandoned apartment a scrap of paper with the name of Plutarco Tello and his birth date on it.  (T. Tr. Vol. II at 351.)

In the early morning hours of November 29, 1998, Fabio Montano was arrested outside Room 433 of the Drury Inn.  This is the room that Tello had rented the night before, out of which Tello stepped as he was arrested, and from which a .9 mm Stallard handgun was recovered.[10]  Montano had $5,200 dollars on his person and admitted that he was there to see Arboleda Ortiz.  (T. Tr. Vol. II at 338, 347-48.)

Borja identified Dominic Lusk as Montano's right-hand man.  (T. Vol. I at 21.)  Borja and Lusk both testified to a drug deal which occurred in the Bannister Mall parking lot in Kansas City, Missouri.  Borja was in a car driven by Colon, and met Montano and Lusk in a car driven by Lusk.  Colon threw a

_____

[10] On November 29, 1998, prior to Montano's arrival at the Drury Inn and Tello's arrest, Sinisterra and Oritz were arrested in the hotel's parking lot.

-16-

book bag containing three to five kilograms of cocaine into the open window of Montano's car, while Montano threw money into the window of Colon's car. Borja and Lusk testified that this transaction was memorable because a few seconds later, a Kansas City, Missouri police officer drove by in a marked car. (T. Tr. Vol. I at 25-26; T. Tr. Vol. II at 312-13.)

Drug ledgers kept by Borja and Colon, and recovered by the FBI the day after Colon's murder, were introduced into evidence at trial and confirmed cocaine deliveries made to Montano as well as the money Montano owed to the conspiracy. Borja testified that Montano was listed in the ledgers as "Fe," "Fernando," or "Fercho." (T. Tr. Vol. II at 166-67.) Borja identified some of the individual entries in the ledgers. One entry listed "Fernando owes 3, at $15,000. Paid 2." Borja explained that Montano had paid for two kilograms of cocaine with $30,000, and still owed the conspiracy for three additional kilograms cocaine. (T. Tr. Vol. II at 168-69.) Another entry, which Borja identified to have been written by Colon, noted, "Fernando, or Fercha, it says, two kilos at $18,000. Three kilos at $18,000. Two kilos at $18,000. One kilo at $18,000. So in total he has five - - he has seven - - eight kilos, and Julian wrote on the side how much a kilo was or maybe money that Fernando had paid. Oh, down there, again, two kilos at $18,000. One kilo at 8,000. So it's 3, 6, 9 - - 11 kilos for Fernando." (T. Tr. Vol. II at 173-74.)

-17-

Borja testified that he personally delivered cocaine to Montano on behalf of the conspiracy. (T. Tr. Vol. II at 176.) Borja's brother Edward Ortiz also testified and confirmed a specific delivery to Montano, in which Borja and Edward Ortiz secreted five kilograms of cocaine in Ortiz's school backpack and delivered it to Montano's apartment. (T. Tr. Vol. II at 211.)

Dominic Lusk testified that in the late 1990's, he worked for Montano by driving drugs from Houston to Kansas City. (T. Tr. Vol. II at 296.) He described the typical delivery; whereby Montano would deliver at least five kilograms of cocaine to Lusk in Houston, Lusk and Montano would then hide the drugs in hidden compartments in a rental car, and Lusk would deliver the drugs to Kansas City, taking his payment for transportation in drugs. (T. Tr. Vol. II at 295-98.) Lusk testified he made approximately 20 such trips. (T. Tr. Vol. II at 302-03.) Lusk also testified he delivered cash proceeds from Kansas City to Houston on behalf of Montano. (T. Tr. Vol. II at 306-07.) He testified that he was arrested in Houston for possession of an ounce of cocaine while driving a vehicle loaded with $26,000 to $46,000. (T. Tr. Vol. II at 307-08.) Montano had given Lusk the money to deliver to the cocaine suppliers, and was a passenger in the car at the time of Lusk's arrest. (T. Tr. Vol. II at 308-10.)

Lusk further testified that he met Borja, Colon, Hinestroza, Arboleda Ortiz, and Tello through Montano. (T. Tr. Vol. II at 301-05.) Lusk testified

-18-

that he began buying his cocaine through Borja, Colon, and Hinestroza. (T. Tr. Vol. II at 311.)  Lusk testified that after Julian Colon's death, Montano called him and attempted to collect an outstanding debt Lusk owed Colon.  A few minutes later, Hinestroza also called Lusk, asking if he owed money to Colon. (T. Tr. Vol. II at 318.)

Marvin Collins testified that he bought cocaine from Montano for a couple of years, from nine ounces to a kilogram or two at a time.  (T. Tr. Vol. III at 370-71.)  Collins testified that at some point, Montano went back to Houston, and Collins received his cocaine through Arboleda Ortiz, although he dealt with both men.  (T. Tr. Vol. III at 375-76.)  Collins further testified that sometimes Montano and Arboleda Ortiz delivered drugs to him together.  (T. Tr. Vol. III at 379.)

Gregory Watson testified that he dealt drugs in 1997 and 1998 in Kansas City, and described a meeting he had with Montano and Montano's wife in order to discuss buying cocaine from Montano.  (T. Tr. Vol. III at 510.) Watson testified that Montano offered to sell him cocaine for $23,000 to $24,000 per kilogram, but Watson thought that price was too high so he declined the deal.  (T. Tr. Vol. III at 511.)  Watson also testified that he was friends with Marvin Collins, and witnessed Montano and Arboleda Ortiz

-19-

deliver three kilograms of cocaine to Collins, who gave Montano and Ortiz a large amount of cash in exchange for the cocaine. (T. Tr. Vol. III at 515-18.)

Artis Jones testified that he began dealing drugs in 1996 with Loren Harris. (T. Tr. Vol. IV at 587-88.) Jones related that Montano supplied Harris with drugs, and that Jones once accompanied Harris to Montano's apartment in Overland Park, Kansas, to pick up cocaine. Jones said that one time Montano delivered cocaine to Jones's girlfriend's garage in Kansas City, Missouri. Jones also testified to a meeting he had with Montano in which Jones proposed buying cocaine from Montano directly. (T. Tr. Vol. IV at 594-95.) Jones identified the piece of paper recovered from Montano's car bearing the name "Artis" and a cell phone number as Jones's writing. (T. Tr. Vol. IV at 595-96.)

Loren Harris testified that he and Artis Jones were friends and partners in drug dealing beginning in 1996. (T. Tr. Vol. IV at 682-83.) Harris said that in 1997 and 1998, Montano supplied him with approximately two to three kilograms cocaine every week or two. (T. Tr. Vol. IV at 684-85.) Harris testified that Montano charged him $20,000 to $21,000 per kilogram. Harris sometimes picked up the cocaine at Montano's apartment in Overland Park, Kansas, and sometimes Montano delivered it. Harris stated that Montano once delivered three kilograms cocaine to Jones's girlfriend's apartment garage in

-20-

Kansas City. (T. Tr. Vol. IV at 685-86.) Harris also testified that Montano worked with Arboleda Ortiz, whom he knew as "Bomba." (T. Tr. Vol. IV at 688.)

Phone records corroborated the cooperating witnesses regarding Montano's relationships with his co-defendants. Special Agent Michael Oyler, FBI, testified that from September 3, 1998, to November 5, 1998, there were 43 calls between Arboleda Ortiz's cell phone and Montano's home phone number in Katy, Texas. He also testified that there were 28 phone calls between Hinestroza's pager number and Montano's cell phone, including nine calls made on the day of Julian Colon's murder, November 28, 1998. (T. Tr. Vol. IV at 730.) Finally, SA Oyler testified to records showing that Sinisterra stayed at the Hampton Inn in Shawnee, Kansas, on November 28, 1998, and that there were three calls to Montano's cell phone that day from that hotel room. (T. Tr. Vol. IV at 567, 578-79.)

Special Agent Ben McIntosh, FBI, testified to wire transfers made to and from Montano, including one wire transfer to Cali, Colombia, and others to co-defendants. (T. Tr. Vol. IV at 663-69.) SA McIntosh also testified that he checked Montano's reported earnings through Social Security, and that in the year 1998, he reported no income. This contrasted with the evidence that Montano had over $5,000 on his person on November 29, 1998, and receipts

-21-

for cash totaling about $7,500 recovered by police from his car and apartment. (T. Tr. Vol. IV at 674.)

Special Agent Marlin Ritzman, FBI, testified concerning a 1993 wiretap of conversations between Montano and various other drug traffickers, including co-defendant Percy Smith.[11] (T. Tr. Vol. IV at 700-21.) This 404(b) evidence was allowed to show Montano's knowledge and intent to participate in a drug trafficking conspiracy. (D.E. 1036 at 9.) During the recording of the December 2, 1993, phone conversation between Montano and an unidentified drug trafficker, the pair discussed a recently seized money shipment and the death of notorious Medellin drug cartel leader Pablo Escobar.

Subsequent to the playing of the tape, Ritzman explained to the jury – based upon his knowledge and experience as a federal agent involved in illegal narcotics investigation for twenty-plus years – the identity and significance of Escobar. (T. Tr. Vol. IV at 717-18.)

---

[11]Through the testimony of FBI Special Agent Marlin Ritzman, the Government presented 404(b) evidence from a 1993 wiretap of conversations between Montano and several other narcotics traffickers (T.Tr. Vol. IV at 701-10) including co-defendant Percy Smith (T.Tr. Vol. IV at 759-60), and a traffic stop of Montano with $126,520 (T.Tr. Vol. IV at 714-16).

-22-

The jury, after hearing the evidence and being appropriately instructed, found Montano guilty on May 27, 2005, of conspiracy to distribute five kilograms or more cocaine.

-23-

## SUMMARY OF THE ARGUMENTS

Montano's conspiracy conviction is supported by ample evidence. Seven lay witnesses, many of whom dealt directly with Montano, testified that he worked with indicted and unindicted co-conspirators to buy and sell multiple kilograms of cocaine from 1996 to 1998. These witnesses were consistent with each other, and were corroborated by drug ledgers, phone records, physical evidence recovered by police from Montano's apartments and car, and a large amount of cash recovered from Montano. When viewed in a light most favorable to the guilty verdict, the Government's evidence is more than sufficient to affirm Montano's conviction.

The evidence surrounding the homicide of co-conspirator Julian Colon was inextricably intertwined with the drug conspiracy where the co-defendants were known to employ violence. Therefore, the evidence discovered by law enforcement was properly admitted by the trial court to show Montano's role and involvement in the drug conspiracy.

-24-

## ARGUMENTS

## I.

**The district court correctly denied Montano's motion for judgment of acquittal under Count One, where witnesses testified that Montano and other co-conspirators acted together for years in buying and selling cocaine, and where that testimony was corroborated by drug ledgers, phone records, wire transfers, and a large amount of currency found on Montano.**

In his first point, Montano argues that there was insufficient evidence to support the jury's verdict. Montano's motion for judgment of acquittal, however, was properly denied by the district court. The jury heard credible testimony from numerous witnesses who stated that Montano and other co-conspirators bought and sold large amounts of cocaine. This testimony was corroborated by drug ledgers, notes, phone records, wire transfers and a large amount of money found on Montano's person. Since there was more than ample evidence to support the jury's verdict, the district court properly denied Montano's motion for judgment of acquittal.

A.     ***Standard of Review***

The Court reviews de novo the sufficiency of the evidence. The evidence is viewed in the light most favorable to the verdict, conflicts are resolved in favor of the government, and all reasonable inferences from the jury's verdict are accepted. *United States v. Castro-Gaxiola*, 479 F.3d 579, 581 (8th Cir.

-25-

2007) (citing *United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002)). As this standard of review is strict, the court does not lightly overturn a jury's verdict. *Id.* The verdict is upheld if any interpretation of the evidence could lead a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Id.*; *United States v. Carter*, ___ F.3d ___, 2007 WL 861092 (8th Cir., Mar. 23, 2007); *United States v. Armstrong*, 253 F.3d 335, 336 (8th Cir. 2001).

**B.** **_Discussion_**

"To support a conspiracy conviction, the Government must show that: (1) a conspiracy existed for an illegal purpose; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly joined in it." *United States v. Tensley*, 334 F.3d 790, 794 (8th Cir. 2003) (citing *United States v. Oleson*, 310 F.3d 1085, 1089 (8th Cir. 2002)). Direct or circumstantial evidence may provide the basis for a conspiracy conviction. *Oleson*, 310 F.3d at 1089; *United States v. McCracken*, 110 F.3d 535, 540 (8th Cir. 1997). Evidence of a conspiracy will "often be circumstantial" due to a conspiracy's "necessary aspect of secrecy." *Cruz*, 479 F.3d at 581 (quoting *United States v. Robinson*, 217 F.3d 560, 564 (8th Cir. 2000)). "Evidence may be implied by surrounding circumstances or by inferences from the actions of the parties." *Cruz*, 479 F.3d at 581 (citing *United States v. Fitz*, 317 F.3d 878, 881 (8th Cir. 2003)).

-26-

Montano concedes that the Government proved the existence of the Hinestroza cocaine conspiracy, and that Montano was present and knew about it. (Montano Brf. 22.) Once a conspiracy's existence has been established, slight evidence connecting a defendant to it may be sufficient to prove the defendant's involvement. *Tensley*, 334 F.3d at 794 (citing *United States v. Hernandez*, 299 F.3d 984, 988 (8th Cir. 2002)). Montano argues however, that the Government failed to prove that he was part of the conspiracy, even though witnesses testified that they bought drugs from him. (Montano Brf. 22-23.)

The Government contends that Montano's involvement in the conspiracy was established many times over through testimony of the cooperating witnesses. For example, both Borja and Lusk testified to a drug transaction in which Borja, Colon, Lusk, and Montano met in a parking lot of a shopping center in Kansas City, Missouri. Colon threw a bag containing three to five kilograms cocaine into the open window of Montano's car, which was driven by Lusk, while Montano threw money into Colon's car. Borja also testified that Montano was one of two major customers buying the cocaine brought into Kansas City by the Hinestroza conspiracy, and the drug ledgers recovered by the FBI corroborate Borja's account. One entry documented the sale of five kilograms of cocaine to Montano; Montano had paid for two of the kilograms

-27-

and owed for the remaining three. Another entry, written by Colon, documented eleven kilograms sold to Montano.

Lusk also testified to twenty occasions in which he transported drugs for Montano. Collins and Harris both testified that they bought kilogram quantities of cocaine from Montano during the conspiracy time-frame. Watson corroborated Collins; he testified that Montano and Arboleda Ortiz made a delivery of three kilograms of cocaine to Watson. Jones corroborated Harris; he testified that he witnessed Montano make a delivery of cocaine to Harris. In addition, both Watson and Jones testified that they met with Montano to discuss Montano supplying them with cocaine.

A defendant need not expressly agree to join a conspiracy, but may do so by tacit agreement. *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004) (citing *United States v. Kamerud*, 326 F.3d 1008, 1012 (8th Cir. 2003)). In *Kamerud*, the defendants argued that they had a buyer/seller relationship with their supplier, which was insufficient to establish a conspiracy. *Kamerud*, 326 F.3d at 1012. This Court disagreed, finding that the government was not required to show an express agreement between the Kameruds and their supplier regarding the subsequent redistribution of the drugs. *Id.* This Court held that because the supplier knew the defendants were redistributing the drugs, the government had proved tacit understanding. *Id.* at 1012-13.

-28-

In this case, the Government produced evidence that Montano bought up to five kilograms of cocaine at a time. Not only did Montano redistribute his cocaine, he sold it Dominic Lusk, Loren Harris, and Marvin Collins, who again redistributed the cocaine they bought from Montano. (T. Tr. Vol. IV at 773-74.) Furthermore, according to cooperating witnesses Marvin Collins, Gregory Watson, and Loren Harris, Montano delivered drugs with Arboleda Ortiz, one of the hired killers convicted of this conspiracy in an earlier trial. Joint delivery of narcotics will support a conspiracy conviction. *United States v. Espino*, 317 F.3d 788, 793-94 (8th Cir. 2003).

The defendant in *Espino* was convicted of conspiracy to distribute and possess with intent to distribute methamphetamine, and challenged the sufficiency of the evidence to support that conviction on appeal. *Espino*, *id.*, 317 F.3d at 791. The government had produced evidence from several witnesses who testified in exchange for the possibility of reduced sentences in their own drug prosecutions, that they either bought from or were delivered methamphetamine by Espino or his wife, Brandy Goatley. *Id.* Like Montano, Espino argued that although the evidence proved he bought and sold narcotics, the evidence did not prove he conspired with anyone. *Id.* at 792. He further argued that the witnesses were biased in that they received a substantial benefit from the government to testify against him. *Id.* This Court noted that the

-29-

witnesses all testified that Espino and Goatley worked together to deliver and distribute narcotics, and that some of the witnesses resold the narcotics they purchased from Espino. *Id.* This Court held that the joint delivery, and resale of narcotics by purchasers was sufficient evidence to sustain the conspiracy conviction. *Id.* at 793-94.

Trips to purchase and transport drugs by a defendant and co-conspirator will also support a conspiracy conviction. *Tensley*, 334 F.3d at 794. In *Tensley*, the defendant claimed that although she bought drugs on numerous occasions, the government failed to prove any agreement between her and others to sell the drugs. *Id.* However, one of the witnesses had testified that the defendant transported cocaine from Chicago to Davenport, Iowa, in payment for cocaine. *Id.* at 792. This Court specifically noted the Chicago trips in affirming the conspiracy conviction. "In particular, testimony regarding the Chicago trips alone supports the jury's finding that Tensley conspired with various people to buy cocaine and heroin for personal use as well as resale." *Id.* at 794.

Thus, Lusk's testimony alone could support Montano's conspiracy conviction, as he testified he transported cocaine for Montano from Houston to Kansas City on twenty occasions, and was paid in drugs. The trip Lusk testified to in which he transported over $20,000 in cash proceeds from cocaine

-30-

sales from Kansas City to Houston, with and on behalf of Montano, further supports Montano's conviction.

Montano cites *United States v. Cabrera*, 116 F.3d 1243 (8th Cir. 1997) in his brief. Cabrera, like Montano, claimed insufficient evidence to prove a conspiracy, although Cabrera, like Montano, acknowledged the evidence showed he distributed narcotics to various individuals. *Id.* at 1247. This Court rejected Cabrera's argument and affirmed the conviction, noting that Cabrera had sold methamphetamine to multiple people on numerous occasions, and further, that most of his customers knew each other. *Id.*

Montano next attacks the quality of the evidence, arguing that many of the Government's witnesses were convicted drug dealers testifying pursuant to a plea agreement. Credibility assessments are the province of the fact-finder. *Tensley*, 334 F.3d at 795 (citing *Hernandez*, 299 F.3d at 989; *United States v. Davis*, 103 F.3d 660, 674 (8th Cir. 1996)). The jury is the ultimate arbiter of a witness's credibility, and that finding will not be disturbed on appeal. *Espino*, 317 F.3d at 794. Even the "uncorroborated testimony of an accomplice is sufficient to sustain a conviction if it is not otherwise incredible or unsubstantial on its face." *United States v. Lop Bounmy*, 403 F.3d 1018, 1021 (8th Cir. 2005) (quoting *United States v. Crenshaw*, 359 F.3d 977, 988-89 (8th Cir. 2004)). The cooperating witnesses in Montano were corroborated: (1) by

-31-

each other's consistent accounts; (2) by drug ledgers; (3) by phone records; (4) by physical evidence such as firearms, notes tying Montano to co-conspirators, and receipts for cash recovered from Montano's apartments and car; and (5) by a large amount of currency found on Montano the day after Colon's murder. Montano's conspiracy conviction is well-supported by competent, corroborated evidence and should be affirmed.

Appellate Case: 06-1680    Page: 38    Date Filed: 05/02/2007 Entry ID: 3306101

## II.

**The district court did not abuse its discretion in allowing the Government to present evidence of a murder committed in furtherance of the drug conspiracy with which Montano was charged, where that murder was committed by co-conspirators known to employ violence in their drug dealings.**

In his second point, Montano alleges that the district court should not have admitted evidence of the murder of Julian Colon, which was a murder committed in furtherance of the drug conspiracy. However, the evidence of the events surrounding the murder was not unduly prejudicial, but instead was inextricably intertwined in explaining the entire drug conspiracy. Consequently, the district court properly admitted the murder evidence.

**A.** ***Standard of Review***

The standard of review for a trial court's evidentiary ruling is for abuse of discretion. *United States v. Dierling*, 131 F.3d 722, 730 (8th Cir. 1997).[12] Further, a trial court has particularly broad discretion in a conspiracy trial. *Id.* Acts committed in furtherance of a conspiracy are admissible as circumstantial evidence that the agreement existed, unless the evidence causes unfair prejudice substantially outweighing probative value. The critical issue

---

[12] Montano incorrectly suggested the standard was whether the district court's error was harmless. (Montano Brf. 8.)

-33-

is the degree of unfairness of the prejudicial evidence and whether it tends to support a decision on an improper basis. *Id*.

**B.** *Discussion*

As the Government's first argument section described, the Hinestroza drug distribution group was exposed when Borja notified law enforcement of the assault on himself and the execution of his uncle Julian Colon. In the fourth superseding indictment filed on March 9, 2004, five defendants including Montano were charged in the conspiracy to distribute illegal narcotics; only Hinestroza was charged with the homicide. Three of the defendants pled guilty, leaving Montano and Hinestroza set for trial. Montano requested severance. The Government argued that Colon's murder took place in furtherance of the drug conspiracy[13] – that Colon's murder was the incident that exposed the drug organization to law enforcement, and that the investigation and evidence of the murder and drug organization were inextricably intertwined or inseparable. (D.E. 1018 at 9-10.)

The magistrate court severed the two defendants on two grounds: (1) the need to avoid a serious risk of prejudice which several courts have concluded

---

[13] The Government specifically argued that the murder of Colon and the attempted murder of Borja Molina were in furtherance of the conspiracy were an attempt to enforce discipline and exact control over subordinate members, and were an attempt to recover lost drug proceeds. (D.E. 1018 at 3.)

-34-

"exists when defendants charged with capital and noncapital offenses are tried together" (D.E. 1022 at 3); and (2) Montano's pretrial detention would further be prolonged by waiting for Hinestroza's trial date (D.E. 1022 at 4). However, prior to trial and despite the severance ruling, the district court ruled that if the Government presented evidence that the co-defendants were known killers within the conspiracy, then evidence of the actions of the co-conspirators, including murder, would be admissible. (Pretrial Tr. 16.) Montano objected throughout the trial to the admission of the homicide evidence, and raises this issue on appeal.

Montano offers a two-pronged argument: (1) that evidence of a murder should not have been allowed in this case because it was overly prejudicial; and (2) by implication, because severance was granted between Montano and the co-defendant charged with the homicide, that the evidence of the homicide should then have been automatically excluded.

Because he fails to point to any specific piece of evidence, testimony, or argument as overly prejudicial, the Government can only conclude that Montano is suggesting that any and/or all of the evidence presented concerning the Colon homicide and the attempted murder of Borja was overly prejudicial.

Simply because evidence is prejudicial does not mean it must be excluded. *United States v. Noland*, 960 F.2d 1384, 1387 (8th Cir. 1992).

-35-

Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Federal Rule of Evidence 403. *United States v. Meester*, 762 F.2d 867, 875 (11th Cir. 1985). Further, Rule 403's "major function is limited to excluding matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.* Great deference is given the district court's balancing of probative value and prejudicial impact of evidence. *United States v. Claxton*, 276 F.3d 420, 422-23 (8th Cir. 2002). It is the Government's position that there was nothing scant or cumulative about the probative necessity of the homicide evidence, a significant portion of which contributed not only to the discovery of the Hinestroza-Montano drug conspiracy, but also to the ongoing investigation which ultimately resulted in the arrests and convictions of eight individuals.[14]

Evidence of a murder occurring during a conspiracy is not *per se* unfairly prejudicial to a co-defendant not charged with that particular homicide. This Circuit has previously recognized that evidence of uncharged violent acts committed by conspirators during and in relation to the conspiracy is direct

---

[14]The eight individuals are: (1) Edwin Hinestroza; (2) German Sinisterra; (3) Arboleda Ortiz; (4) Plutarco Tello; (5) Percy Smith; (6) Fabio Montano; (7) Shelly Anderson; and (8) Airton Mosquera.

Appellate Case: 06-1680    Page: 42    Date Filed: 05/02/2007 Entry ID: 3306101

evidence of the conspiracy and is therefore admissible. *United States v. Maynie*, 257 F.3d 908, 916 (8th Cir. 2001).

Specifically, this Court in *United States v. Dierling*, 131 F.3d 722 (8th Cir. 1997), held that evidence of a murder was relevant and not overly prejudicial to a drug conspiracy case when the slaying was an act to control subordinates in the meth-distribution conspiracy and the evidence showed the lengths the conspirators would go to protect their interests. *Dierling*, *id.* at 731. *See also United States v. Baker*, 855 F.2d 1353 (8th Cir. 1988); *United States v. Tramunti*, 513 F.2d 1087, 1118 (2d Cir. 1975); and *United States v. Meester*, 762 F.2d 867, 874 (11th Cir. 1985) (all cases in which evidence of murders committed in furtherance of a conspiracy were admitted in drug conspiracy cases).

In his argument, Montano suggests the facts in this matter closely mirror *United States v. Conely*, 503 F.2d 520 (8th Cir. 1995), in which the defendant was convicted of illegally selling heroin, but had the conviction reversed because of the prejudicial effect of the testimony of a government witness regarding drug-related murders. *Id.* at 521, 524. The facts in this matter are distinguishable from *Conely* and more closely resemble those facts in the *Dierling* decision where this Court upheld the admission of uncharged homicide evidence.

-37-

The first point of distinction is that *Conely* was a distribution case, while the present case and *Dierling* are conspiracy cases. Typically a distribution case covers a single event, while conspiracies stretch over a wide range of time and events. In drug cases these events typically include acts of violence to protect or further the conspiracy. In *Dierling*, this Court ruled that because the violent acts were committed in furtherance of a conspiracy the acts were admissible as circumstantial evidence that the agreement existed. *Dierling*, 131 F.3d at 730.

Further, in *Conley,* the police officer testified that the events of the crime charged coincided with "killings" in the area, but never made a connection between the two. *Conley*, 503 F.2d at 523. Defense counsel objected, and the jury was instructed to disregard the testimony, but a mistrial was denied. *Id*. Conversely, in the present matter and in *Dierling*, the murders were an inseparable part of the drug conspiracy. In *Dierling*, the victim Danny Craig was actively involved in the conspiracy, and he was killed as a result of a drug debt owed to Dierling. This Court went on to say in the *Dierling* decision that "[t]he slaying was an act by the conspiracy's leaders to control a subordinate member . . . [and] showed the lengths the conspirators would go to protect their interests in the long term viability of the conspiracy, . . .[and] demonstrated concerted drug-related action by all the conspirators." *Dierling*, *id.* at 722.

-38-

The admission of intertwined or inseparable facts has historical precedent in this Circuit.  *See United States v. Bass*, 794 F.2d 1305, 1312 (8th Cir. 1986) (holding evidence of other crimes were admissible when they were so "blended or connected" to the charged crime that they were an integral part of the overall context).  Several other Circuits have also regarded a murder as so intertwined with a drug conspiracy that evidence of the murder was admitted despite the prejudicial impact of the evidence.  *United States v. Baker*, 432 F.3d 1189, 1209, 1214, 1218 (11th Cir. 2005); *United States v. Hicks*, 368 F.3d 801, 807 (7th Cir. 2004); *United States v. Gadson*, 74 Fed. Appx. 245, 248 (4th Cir. 2003); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996);*United States v. McCullah*, 76 F.3d 1087, 1104 (10th Cir. 1996).  *See also United States v. Smith*, 2006 WL 3144383, *2 (D. Kan. 2006).

Montano incorrectly states that the "only evidence linking Montano, the conspiracy and the murder" was the testimony of Officer Amy Billquist. (Montano Brf. 14.)  Officer Billquist testified about Montano arriving at the hotel – where Colon's killers were arrested – shortly after the homicide, carrying $5,000 in cash.  Aside from Officer Billquist, the Government presented a total of 28 witnesses and a vast amount of physical evidence tying Montano to the conspiracy.  Of these, seven witnesses (Borja, Edward Ortiz, Dominic Lusk, Marvin Collins, Gregory Watson, Loren Harris, and Artis Jones)

-39-

specifically testified they witnessed Montano's drug distribution activities to include or involve the victim Julian Colon and/or the convicted assassins Hinestroza, Sinisterra, Arobeloda Ortiz, and Tello. The Government combined these witnesses with Montano's arrival at the shooters' hotel room carrying over $5,000 cash; the search of Montano's apartment that uncovered two handguns, one a .44 Magnum loaded with hollow point bullets (T.Tr. Vol. II at 351.); a scrap of paper with Plutarco Tello's name and his date of birth (T. Tr. Vol. III at 462); a scrap of paper with the name of the hired killer "German Sinsterra" written upon it found by an agent during a search of Montano's vehicle (T. Tr. Vol. IV at 610-11); and finally, phone records indicating nine calls between Hinestroza and Montano on the day of Julian Colon's murder. (T. Tr. Vol. IV at 730.) All total, the collection of irrefutable evidence which connected Montano, the conspiracy, and Colon's killers was necessary to properly depict Montano's role in a violent drug conspiracy of which the homicide was an inseparable part.

Based upon his wide-ranging discussion of severance, Montano also implicitly has argued that the district court's severance ruling should have precluded the use of any of the homicide evidence associated with the conspiracy against Montano. However, Montano presented no authority to support this argument. In the magistrate court's order regarding the severance,

Appellate Case: 06-1680     Page: 46     Date Filed: 05/02/2007 Entry ID: 3306101

there was no prohibition against the use of some of the homicide evidence to explain the discovery, nature, or scope of the drug conspiracy and its membership. In fact, the case cited by the magistrate court on page four of its order, *United States v. Williams*, 181 F.Supp.2d 267 (S.D.N.Y. 2001), concedes the possibility that a situation could exist and that evidence of the homicide could be admitted against a severed defendant charged in a related conspiracy, however "details of those acts, such as grisly photos of the crime scene or the victims would likely not be admissible to prove the narcotics conspiracy." *Williams*, *id.* at 302. Further, it should be noted that *Williams* has a critical feature distinguishing it from the Montano facts. The *Williams* defendant, who was severed, was not charged with any of the RICO counts, and because of this, the district court concluded that evidence of murders committed in aid of racketeering would not have been admissible against her were she tried separately. *See Williams* generally. This point was noted and distinguished in *United States v. Stone*, 2006 WL 436012, *3 (E.D.N.Y 2006) (citing *Williams*, 181 F.Supp. 2d at 302). In the matter before this Court, Montano was charged in the drug conspiracy surrounding the homicide which – similar to the broad range of RICO charge – should allow the Government to present a wide variety of evidence.

-41-

Under *Pinkerton v. United States*, 328 U.S. 640, 647 (1946), and this Circuit's subsequent cases, each member of a conspiracy may be held criminally liable for any substantive crime committed by a co-conspirator in the course and furtherance of the conspiracy, even though those members did not participate in or agree to the specific criminal act. *United States v. Narvarrete-Barron*, 192 F.3d 786, 792 (8th Cir. 1999). If a conspirator commits a reasonably foreseeable offense in furtherance of the conspiracy, then all current members may be convicted of the offense solely by virtue of their membership in the conspiracy. *See United States v. Escobar*, 50 F.3d 1414, 1420 (8th Cir. 1995). For this reason, the district court's discretion in determining the admissibility of evidence is "particularly broad in a conspiracy trial." *United States v. Darden*, 70 F.3d 1507, 1538 (8th Cir. 1995). Hence, any act committed in furtherance of the conspiracy (the murder of Julian Colon) by any member of the conspiracy (the assassin Sinisterra) should come in as evidence to describe the nature of that conspiracy, its membership (Montano) and their roles, even if the act in furtherance of conspiracy is not charged to a particular defendant.

Even though not charged under the *Pinkerton* legal theory, Montano's actions and statements show his foreseeable knowledge that homicide was a likely tool of the conspiracy. Borja, Edward Ortiz, Lusk, and Collins testified

-42-

that Montano knew Ortiz, Sinisterra, and/or Tello. Further, Montano made numerous phone calls to the assassins Hinestroza and Sinisterra, on the date of Colon's murder. Aside from the witnesses' testimony, Montano's possession of firearms, notes with the names and other information of two of the killers, and appearance at the killers' hotel with $5,000 in cash, are all significant pieces of evidence showing his understanding that violence was an instrument of this conspiracy.

Finally, Montano alleged the testimony by FBI Special Agent Marlin Ritzman concerning Pablo Escobar was overly prejudicial. (Montano Brf. 15.) Montano does not address the context of Ritzman's testimony, proposing that Ritzman's statements were random and had no relation to the trial. This was not the case. On April 29, 2005, the Government filed its notice of intent to use 404(b) evidence, specifically outlining the 1993 wiretap managed by SA Ritzman, which contained evidence of recorded conversations between Montano and several drug traffickers including co-defendant Percy Smith. (D.E. 1036 at 3-6 .) Even more specific in the Government's motion was a description of a December 2, 1993, Montano telephone conversation, the topic of which was seized money and the death of notorious Medellin drug cartel leader, Pablo Escobar. (D.E. 1036 at 6.) The district court admitted the use of

-43-

the 1993 recorded conversations under Rule 404(b) to show Montano's intent and his knowledge of the conspiracy. (Pretrial Tr. 9.)

The Thompson-Montano-Hinestroza connection was presented through a litany of other witnesses; Special Agents Peter Ranallo, Joe Twardowski, Mike Oyler, and Ritzman, as well as Kansas City Police Officers Bill Koetting and John Cornell, and co-conspirator Percy Smith, who testified he had introduced Hinestroza and Thompson, prior to playing of the tapes. Several of the recorded conversations were then played and translated for the jury during the trial, including the December 2, 1993, call in which Montano and an unidentified drug trafficker discussed the death of Escobar. (T. Tr. Vol. IV at 716.) Subsequent to the playing of the tape, Ritzman explained to the jury, from his knowledge and experience as a federal agent involved in illegal narcotics investigation for 20-plus years, the identity and significance of Escobar. (T. Tr. Vol. IV at 717-18.)

The evidence of the murder of Julian Colon and shooting of Borja was intertwined with the cocaine conspiracy, and therefore, was properly admitted into evidence by the trial court. Montano's point should be denied.

Appellate Case: 06-1680     Page: 50     Date Filed: 05/02/2007 Entry ID: 3306101

## <u>CONCLUSION</u>

Montano's conspiracy conviction is supported by more than ample evidence, and the district court did not abuse its discretion in allowing evidence of a related murder committed in furtherance of the cocaine conspiracy to be presented to the jury. Accordingly, Montano's conviction should be affirmed.

Respectfully submitted,

JOHN F. WOOD
  United States Attorney

By

GREGG R. COONROD
  Assistant United States Attorney

KATHLEEN D. MAHONEY
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri  64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

-45-

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C), that this brief complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B) and contains 10,366 words. The brief was prepared using WordPerfect for Windows, Version 12.0 software. In making this certification, I have relied upon the word-count feature of WordPerfect for Windows, Version 12.0. Furthermore, the enclosed disk has been scanned and been determined to be virus-free in compliance with the Eighth Circuit Rule 28A(c).

_____
Gregg R. Coonrod
Assistant United States Attorney

Appellate Case: 06-1680    Page: 52    Date Filed: 05/02/2007 Entry ID: 3306101

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that two copies of the Government's brief and a virus-free diskette were mailed this 1st day May of 2007, to:

Greg T. Rinckey, Esquire
Tully, Rinckey, & Associates, PLLC
3 Wembley Court
Albany, New York  12205
Attorney for Fabio Montano

_____
Gregg R. Coonrod
Assistant United States Attorney

-47-